**The ADAMSON COMPANIES, a California Partnership, Plaintiff,**

**v.**

**CITY OF MALIBU; and City Council for the City of Malibu, Defendants.**

**The KISSEL COMPANY, INC., Plaintiff,**

**v.**

**CITY OF MALIBU; and City Council for the City of Malibu, Defendants.**

**Nos. CV 92–1027 MRP, CV 92–1028 MRP.**

United States District Court, C.D. California.

June 6, 1994.

Thomas E. Gibbs, Michael S. Greger, Allen, Matkins, Leck, Gamble & Mallory, Irvine, CA, for plaintiff the Adamson Companies.

Garrett L. Hanken, Elizabeth Watson, Kiersten Y. Mayer, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, CA, for plaintiff the Kissel Co., Inc.

Michael Jenkins, City Atty., City of Malibu, Rochelle Browne, Saskia T. Asamura, Mitchell E. Abbott, Richards, Watson & Gershow, P.C., Los Angeles, CA, for City of Malibu, and City Council for the City of Malibu.

## OPINION

PFAELZER, District Judge.

### I. BACKGROUND

On December 3, 1991, the City of Malibu ("City") acting through its City Council ("City Council") adopted a mobile home rent control ordinance ("rent control ordinance"). Malibu Municipal Code, Article VI, Chapter 7, Ordinance 48–U. Plaintiffs The Kissel Co. ("Kissel") and The Adamson Companies ("Adamson") are the owners of the only two mobile home parks within the City. Kissel owns a park called Paradise Cove Mobile Home Park ("Paradise Cove") and Adamson owns a park called Point Dume Club ("Point Dume").

The plaintiffs brought these companion cases to obtain a judgment that the rent control ordinance violates the constitutional guarantees of substantive due process and equal protection, as well as the guarantee against taking property without just compensation under the Fifth Amendment.[1]

Mobile home rentals are quite different from apartment rentals. The "tenant" buys a mobile home or "coach" which he then places on a space or "pad" in a mobile home

---

1. Adamson also asserts a claim for inverse condemnation under the California Constitution.

The plaintiffs also sought relief on the ground that the rent control ordinance was an unconstitutional ex-post facto law or bill of attainder and that the rent control ordinance violated California Government Code § 54950 (the "Brown Act"), and the California Environmental Quality Act ("CEQA"). The Court has previously dismissed those claims.

park. In California, the tenants usually rent or lease the space from a park owner. In addition to the investment in the coach and its initial placement, most tenants invest in permanent improvements such as landscaping, decks and patios. Likewise, the park owner makes an investment not only in the land, but also in providing facilities for the use of the tenants, such as private roads, plumbing and common areas. Thus, unlike an ordinary rental, both the park owner and the tenant make substantial capital investments in a mobile home tenancy.

Mobile homes, despite their name, are not usually mobile. Once placed in a park, few are moved.[2] This is principally due to the cost of moving a coach which is often equal to or greater than the value of the coach itself. Also, many mobile home parks will not accept older coaches so that after a time, the coach may be rendered effectively immobile. Thus, the park owner, absent regulation, theoretically has the power to exact a premium from the tenant who, as a practical matter, cannot move the coach.

In this situation, if the tenant·decides to live elsewhere, he does not move the coach, but rather sells it "in place." The buyer, then, becomes the new tenant. The California Mobile Home Residency Law, not challenged here, forbids the termination of a mobile home tenancy without cause, as well as the assessment of transfer fees, and requires that the park owner accept any buyer of the coach as a tenant so long as the purchaser has the ability to pay the rent. Cal.Civ.Code § 798 *et seq.* As a consequence of the tenant's guaranteed occupancy and his freedom to sell without penalty, any economic power the park owner might potentially have over the tenant is significantly lessened.

A number of jurisdictions, including the City, also have enacted rent control ordinances to protect mobile home tenants be-cause of a concern that the California Mobile Home Residency Law does not go far enough. The economic justification most often advanced for such ordinances is that even though the space is freely marketable by the tenants, the park owner can, by raising the rent to unreasonable levels, effectively destroy the tenant's ability to realize a fair return on his investment by selling the coach in place. Theoretically, in a free market, such behavior would eventually put the park owner out of business because there would be other park owners willing to offer mobile home spaces on more reasonable terms. The City argues, however, that there is no operational market, but rather a monopoly[3] on the part of the park owner created by the scarcity of mobile home spaces. The existence of this monopoly is a further justification claimed by the City for the enactment of the rent control ordinance.

### A. The Rent Control Ordinance

The rent control ordinance applies to all mobile home spaces in the City with the exception of those spaces subject to long-term leases governed by state law. The plaintiffs challenge the following provisions of the rent control ordinance:

1. *Rent Rollback*—The rent control ordinance requires that mobile home rents be rolled back to the rates in effect on December 31, 1984 and then adjusted by the City Manager according to the terms of the Los Angeles County Rent Control Ordinance and Park Conversion Ordinance ("LA Ordinance"). The LA Ordinance had governed the rents in Paradise Cove prior to the incorporation of the City in 1991. Rent Control Ordinance § 6701 B, 6705 C. Point Dume was exempt from the LA Ordinance.[4] In effect the rollback gives the rent control ordinance an eight year retroactive application.

---

**2.** Once in place, approximately one in every hundred mobile homes is ever moved. Hirsch & Hirsch, Legal–Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol, 35 U.C.L.A.L.Rev. 399, 405 (1988).

**3.** Oligopoly is perhaps a more appropriate term because rather than a single source, tenants are faced with a limited set of options in the mobile home market. However, because the City used the term "monopoly" to describe the economic condition that it believed justified its ordinance, the Court adopts that usage.

**4.** The Los Angeles County ordinance exempted all spaces in any park that offered a model lease set forth in the ordinance.

2. *Rent Control*—The rent control ordinance allows increases in rents per year only up to 75% of the increase in the Consumer Price Index or 5%, whichever is less. Rent Control Ordinance § 6708 A.

3. *Rent Freezes*—The rent control ordinance prohibits any rent increases prior to March 28, 1993, thereby freezing rents in the parks for two years after its enactment. Rent Control Ordinance § 6708 A. Additionally, upon the expiration of any exempt long-term lease, the ordinance freezes rents for three years thereafter. *Id.* The ordinance provides one exception to the three year freeze at the expiration of long term leases. If the park owner does not increase the rent pursuant to the lease between March 28, 1992 and March 28, 1993, no formula increases are allowed for one year following the expiration of the lease. *Id.*

4. *Vacancy Control*—Upon the vacancy of a space, the rent control ordinance originally allowed an increase of not more than 18% over the last rent in effect prior to a vacancy.[5] Rent Control Ordinance § 6708 B. In September 1992, the City Council amended the rent control ordinance to reduce the allowable increase to 10% when a vacancy occurs. Rent Control Ordinance § 6708 B., *as amended,* September 16, 1992.

5. *Closure Conversion Restrictions*—Initially, the rent control ordinance required that if the park owner wished to close the park, it was required to prepare a "conversion impact report" which, among other things, required the payment of relocation costs. Rent Control Ordinance § 6723 D.2.g. The ordinance required the park owner to "take steps to mitigate the adverse impact on the tenants, not to exceed the reasonable costs of relocation." Rent Control Ordinance § 6723 D.3. Under the original ordinance, if a tenant elected not to relocate upon conversion, the park owner was required to purchase the mobile home at 15% above its in-place market value. Rent Control Ordinance § 6723 D.3.a. The City Council later amended the ordinance to allow tenants to waive the protection of the closure conversion provisions and to allow the park owner and the tenants to agree to a mutually satisfactory relocation plan. Rent Control Ordinance § 6723 D.3., *as amended,* August 24, 1992. Under both the original and the amended rent control ordinance, however, the park owner may not close the park or convert it to a different use without first obtaining approval from an advisory agency[6] and the City Council. Rent Control Ordinance § 6723 C.3. Both the original and the amended rent control ordinances grant the advisory agency discretion to impose "such conditions as it finds necessary to mitigate the adverse impacts on the residents," up to the reasonable costs of relocation. Rent Control Ordinance § 6723 F. The park owner may appeal the advisory agency's decision to the City Council. Rent Control Ordinance § 6723 G.

6. *Pass–Throughs*—The rent control ordinance allows two kinds of costs to be passed through from the park owner to the tenants. First, the park owner can require tenants to reimburse the park owner for out-of-pocket costs of providing government-required services not compensated by other sources upon sixty days written notice. Rent Control Ordinance § 6708 D.1. The rent control ordinance, however, excludes "predictable expenses for operation" from the definition of government-required services. Rent Control Ordinance § 6708 D.1.b. The rent control ordinance also allows the park owner to pass through the costs of any capital improvement to the tenants, so long as the improvement has a useful life of at least five years, is permanently affixed, and is approved by at least two-thirds of the tenants. Rent Control Ordinance § 6701 D.1.e & § 6708 D.2., *as amended,* September 16,

---

5. In the case of mobile home rentals, the term "vacancy" does not accurately describe the legal or physical condition of the land upon a change in tenancy. Usually, the tenant sells the coach in place on the property and the buyer of the coach takes the tenancy from the seller of the coach. Consequently, the space never actually becomes "vacant."

6. The advisory agency is defined as "the Planning Department, commission, or hearing officer as designated by the City Council." Rent Control Ordinance § 6723 B.1.

1992. The rent control ordinance as originally enacted allowed the park owner to pass through the cost of capital improvements upon approval by 50% of the tenants, but the City Council amended the ordinance to increase the approval ratio requirement to two-thirds.

7. *Adjustments to Assure a Fair and Reasonable Return*—The rent control ordinance establishes the Malibu Mobile Home Park Rent Stabilization Commission ("the Commission"). Rent Control Ordinance § 6703 A. The Commission is comprised of five residents of the City, none of whom may have been either park owners or park residents within the five years preceding their appointment. *Id.* The members of the Commission must be appointed by a four-fifths majority of the City Council, but "shall serve at the pleasure of the City Council." *Id.* A park owner is entitled to apply to the Commission for an adjustment to one, some, or all of the spaces in the mobile home park "in order to establish the maximum allowable rent or to achieve a fair and reasonable return." Rent Control Ordinance § 6708 C.

In evaluating a request for a rent increase, the Commission is directed to consider all relevant factors including operation costs, utility rates, property tax changes, insurance, advertising, variable mortgage rates, governmental assessments and fees, incidental services, employee costs, normal repair and maintenance, capital improvements, upgrading or addition of amenities, and the level of rent necessary to permit a just and reasonable return on the property. Rent Control Ordinance § 6712 A. Although the Commission is directed to consider a broad range of factors, its implementation of any rent increase is severely limited by other substantive provisions of the rent control ordinance. For example, although the Commission is directed to consider the costs of capital improvements, it cannot implement an increase based on capital improvement expenses unless the park owner has complied with the capital improvement requirements of the ordinance's pass-through provisions. Rent Control Ordinance § 6708 D.2.

The Commission is also severely restricted in adjusting base rent. Under the rent control ordinance, the base rent for month-to-month spaces is the rent charged on December 31, 1984 as adjusted according to the terms of the Los Angeles County Rent Control Ordinance until the effective date of the Malibu Rent Control Ordinance, and the base rate for long term leases is the rent charged at the time the lease expires. Rent Control Ordinance § 6701 B. Under the rent control ordinance, it is presumed that the base rent is a fair and reasonable return, and that presumption can be rebutted only by a showing by the park owner that its operating expenses were unusually high or low in the base year as compared to other years. Rent Control Ordinance § 6712 C.1. The Commission is directed to consider only the following factors: (1) if the park owner made substantial capital improvements in 1991, which were not reflected in the rent levels on the base date; (2) substantial repairs were made due to damage caused by natural disaster or vandalism; (3) maintenance and repair was *below* accepted standards; or (4) other expenses were unreasonably high or low notwithstanding the following of prudent business practices. Rent Control Ordinance § 6712 C.1.a–d. The Commission is also allowed by the rent control ordinance to consider whether the rent on the base date was disproportionate because of variations in rent over the term of a lease, seasonal variations in rent, or an anomaly created by a special premium charged or rebate given. Rent Control Ordinance § 6712 C.2. The rent control ordinance does not allow the Commission to consider other factors in the determination of base rent.

B. *The Zoning Ordinance*

In February of 1993, after the rent control ordinance was amended, the City enacted an interim zoning ordinance ("the zoning ordinance") which is set forth in Article IX, Chapter 9100, *et seq.* of the Malibu Municipal Code. Following the City's adoption of the zoning ordinance, the Court granted the plaintiffs leave to amend their complaints to allege the adoption and impact of the zoning ordinance on the plaintiffs' property. Each plaintiff did so. Nevertheless, the Court analyzes the zoning ordinance only for the pur-

pose of ascertaining its effect when taken together with the rent control ordinance. The constitutionality of the zoning ordinance itself is not before the Court.

The zoning ordinance establishes a mobile home zone within the City, the boundaries of which "shall be the area developed for mobile home park use and existing on March 28, 1991, including all leachfields servicing the park." Zoning Ordinance § 9201. None of the other designations established by the zoning ordinance accommodate mobile home use. Consequently, the zoning ordinance effectively prohibits the operation of any mobile home park within the City except for the two existing parks.

The zoning ordinance limits the permitted uses within the mobile home zone to: (a) "[a]ny mobilehome park and associated facilities in existence as of March 28, 1991"; and (b) "[t]he keeping of domestic animals." Zoning Ordinance § 9241. The zoning ordinance allows four conditionally permitted uses within the mobile home zone. They are: (a) uses and structures associated with the operation of a mobile home park; (b) modifications to the number, layout or density of mobile home spaces within an existing mobile home park; (c) modifications of roads, landscaping, parking areas, etc.; and (d) the operation of a recreational vehicle park. Zoning Ordinance § 9242.

The zoning ordinance forbids the use of land in any manner other than that permitted by the zone in which the land is located. Zoning Ordinance § 9110. Moreover, although the zoning ordinance establishes a variance procedure, a variance "shall not be granted ... which authorizes a use or activity which is not otherwise expressly authorized by the zoning regulations governing that parcel of property." Zoning Ordinance § 9460. As a consequence of the restriction of permissible uses within the mobile home zone to those associated with the operation of a mobile home park, a park owner cannot convert a park to a different use without an application to the City Council for an amendment to the zoning map. Because the zoning ordinance does not allow mobile home park use in any other zone, a landowner who desires to establish a new park within the

City would be barred from doing so unless he were able to convince the City Council to amend the ordinance.

### C. *The Regulatory Scheme as a Whole*

██ The rent control ordinance and the zoning ordinance combine to create the regulatory scheme challenged by the plaintiffs. Therefore the Court must examine not only the individual elements of this regulatory scheme, but also the regulatory scheme as a whole. This is necessary because even if each element standing alone would be constitutional, the scheme must fall if, taken as a whole, it exceeds constitutional bounds.

As a starting point, there can be no doubt that the regulatory scheme is weighted heavily against the park owners. The rent control ordinance limits the owners' return on the parks both now and in the future, and the record shows that the requirements to obtain an increase in revenue are exceedingly difficult for a park owner to meet. Further, the rent control ordinance taken together with the zoning ordinance makes it virtually impossible for the park owners to change the use of the park property. Consequently, the park owners are left with a choice of operating the park indefinitely for a low return or attempting to run the extremely tight and costly administrative gauntlet required to change the use of the property. Given the views expressed by the City, such an attempt would clearly be futile.

Each of the plaintiffs has brought a summary judgment motion seeking a declaration that the rent control ordinance in conjunction with the zoning ordinance effects a physical taking of the plaintiffs' property. The City has brought summary judgment motions against each plaintiff seeking a determination that the rent control ordinance is constitutional. To resolve these motions, the Court held a hearing limited solely to the issue of whether the ordinance substantially advances a legitimate purpose. The resolution of the other issues presented did not require the presentation of evidence.

### II. *CONSTITUTIONAL ANALYSIS*

#### A. *Substantive Due Process*

██ The plaintiffs challenge the rent control ordinance as a substantive violation of

the Due Process Clause of the Fourteenth Amendment. A substantive due process challenge to an economic regulation must satisfy a two-part test: (1) does the ordinance serve a legitimate purpose, and (2) are the means employed rationally related to the legitimate purpose? *Moore v. East Cleveland,* 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 1935 n. 6, 52 L.Ed.2d 531 (1977). The Ninth Circuit has articulated the test as one which requires that the plaintiff "prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Sierra Lake Reserve v. City of Rocklin,* 938 F.2d 951, 957 (9th Cir. 1991), *vacated and remanded,* —— U.S. ——, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992), *adhered to in relevant part,* 987 F.2d 662 (9th Cir. 1993); *see also Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Moore,* 431 U.S. at 498 n. 6, 97 S.Ct. at 1935 n. 6 ("Later cases [after *Euclid* ], have emphasized that the general welfare is not to be narrowly understood; it embraces a broad range of government purposes.").

■ Rent control is a form of price-control regulation. The standard for determining whether a state price control regulation is constitutional under the Due Process Clause is well established: Price control is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to a legitimate government purpose. *Pennell v. City of San Jose,* 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988). The government may intervene in response to a threat of monopoly pricing, or to remedy a discrepancy between supply and demand of a certain product, or to protect consumer welfare. *Pennell,* 485 U.S. at 11–13, 108 S.Ct. at 857–58. In particular, "states have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Id.* at 12 n. 6, 108 S.Ct. at 857 n. 6.

In order to determine whether the rent control ordinance in whole or in part violates the Due Process Clause, consideration must first be given to whether the ordinance promotes any legitimate government purpose, and then to whether the ordinance is rationally related to that purpose.

*1. Does the City have a legitimate government purpose?*

The rent control ordinance itself states the following purposes:

Sec. 6700 Purpose of Provisions

A. When the County of Los Angeles adopted Chapter 8.57 of the Los Angeles County Code (Ordinance No. 87–0228) to regulate mobile home parks in the unincorporated areas of the County, the County found that *there was within the County of Los Angeles a shortage of spaces for the location of mobilehomes.* The area that is now the City of Malibu was previously part of the unincorporated area of the County and was subject to chapter 8.57 of the Los Angeles County Code. The City of Malibu incorporated on March 28, 1991. *There continues to be a shortage of mobilehome spaces in the area that is now the City of Malibu.* Because of this shortage, there is a *low vacancy rate* and *rents are presently rising* and causing concern among a substantial number of mobilehome park residents. Because of *the high cost of moving mobilehomes;* the potential for damage resulting therefrom; the requirements relating to the installation of mobilehomes, including permits, landscaping and site preparation; *the lack of alternative homesites for mobilehome residents;* and the substantial investment of homeowners in such homes, *a virtual monopoly exists in the rental of mobilehome park spaces,* creating a situation where park owners have unbridled discretion and ability to exploit mobilehome park residents and homeowners.

B. Homeowners are in the unique position of having made a *substantial investment* in a mobilehome that is situated on land that is rented or leased. In this situation both the park owner and the homeowner have a financial stake in the relationship.

C. Additionally, because *park space is virtually unavailable* and *relocating difficult and costly,* the closure of a mobilehome park or its change of use has disastrous implications or results for home-

owners, who may find it impossible to relocate to a comparable park.

D. For these reasons, among others, the City Council finds and declares it necessary to protect the owners and occupiers of mobilehomes from unreasonable rent increases, while at the same time recognizing the need of park owners to receive a fair return on their property. In addition, the City Council finds that it is necessary to provide for the preparation and approval of reports evaluating the impact of changes of use of the parks and provide for measures to mitigate the impact on residents of these changes of use.

Rent Control Ordinance § 6700 (emphasis added). In the legislative history of the rent control ordinance, the City has identified other purposes, for example:

Our purpose in the Ordinance is to provide the strictest rent stabilization possible and to keep the return of the park owners down to the absolute constitutional minimum.

[Transcript of Proceedings before the City Council of Malibu, November 5, 1991, testimony of Asst. City Attorney Hogin, Record of Proceedings, at 399].

In addition, although not officially adopted as a purpose by the City Council, the argument runs throughout the legislative history that the ordinance was adopted to protect low income tenants of the parks. Perhaps the protection of low income tenants was not adopted as an official purpose due to a recognition by the City Council that the population of the parks is, in fact, wealthier than average. In this regard, the City Attorney's memorandum to the City Council states:

Malibu has two mobilehome parks: Point Dume and Paradise Cove. Both parks are upscale, first class mobilehome parks. *Indeed, in certain respects, the demographics for the Malibu mobilehome parks is different than ordinarily found in mobilehome parks.* The Malibu mobilehome parks enjoy a mix of retirees, younger professionals, and those who live elsewhere but maintain a mobilehome as a weekend or second home. Park residents are both longtime

residents of the Malibu community and newcomers to the community.

[Memorandum to City Council, October 17, 1991, Asst. City Attorney Hogin, Record of Proceedings, at 43] (emphasis added). Nonetheless, the City has continued to assert that the protection of low income tenants was a major purpose of the rent control ordinance.

Summarizing all of the City's contentions, the Court is able to identify four stated purposes for the ordinance. They are (1) to correct a monopoly-driven power disparity between the park owners and the tenants; (2) to protect the substantial investment that the tenants have made in their homes; (3) to protect low income tenants; and (4) to reduce the return of the park owners to the constitutional minimum. The Court finds that the second and third purposes are legitimate justifications for the City's rent control ordinance, but the first and fourth are not.

■ As to the alleged monopoly-driven power disparity, it is clear that if one existed at all, it would have to have been created by what the City claims is a shortage of mobile home spaces. Yet, the City did absolutely no independent investigation of whether a shortage of mobile home spaces actually existed in 1991, or whether, if it existed in Los Angeles, it also existed in or had any effect on the Malibu area. Rather, the City uncritically adopted the findings of the Los Angeles County ordinance, an ordinance that applies not only to a much broader geographic area than Malibu, but also to all forms of rental housing. Thus, the City's position is not based on actual facts, but instead on the notion that because other courts have accepted the monopoly argument in other contexts and other geographical areas, this Court is compelled to accept it as applied to mobile home housing in Malibu. See, *e.g.*, *Pennell*, 485 U.S. at 12, 108 S.Ct. at 857–58 (accepting monopoly argument where plaintiffs did not dispute it); *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 160–64, 130 Cal.Rptr. 465, 488–91, 550 P.2d 1001, 1024–27 (1976) (holding that findings made by lower courts showed rational basis for monopoly argument in the specific context of apartment rentals in Alameda

County).[7]

The difficulty with the City's position is that no matter what conditions exist elsewhere, this Court is not bound to find that those same conditions necessarily exist in Malibu. Although the existence of facts upon which the validity of an enactment depends is presumed, their non-existence can properly be established by proof. *United States v. Carolene Products Co.,* 304 U.S. 144, 152–54, 58 S.Ct. 778, 783–85, 82 L.Ed. 1234 (1938); *Birkenfeld v. City of Berkeley,* 130 Cal.Rptr. at 488, 550 P.2d at 1024. Accordingly, if the park owners show that the alleged shortage-driven monopoly does not exist in Malibu, this rationale cannot justify the rent control ordinance. *Birkenfeld,* 130 Cal.Rptr. at 488, 550 P.2d at 1024 ("[T]he constitutionality of residential rent controls under the police power depends upon the actual existence of a housing shortage and its concomitant ill effects of sufficient seriousness to make rent control a rational curative measure."); *also see Lockary v. Kayfetz,* 917 F.2d 1150, 1155 (9th Cir.1990) ("Although a water moratorium may be rationally related to a legitimate state interest in controlling a water shortage, [the plaintiffs] have raised triable issues of fact surrounding the very existence of a water shortage."). The record made at the Court's hearing on this issue leaves no doubt that the monopoly theory presented by the City is fundamentally flawed, and that any limited power disparity that might exist between the park owners and the tenants is not sufficient to justify a regulatory scheme as onerous as the one under review here.

In support of the contention that the shortage of mobile home spaces in Los Angeles County creates a situation in which the landlord has monopoly power to raise the tenants' rents in Malibu, the City points to a study of ocean-oriented mobile home parks which was prepared for Kissel in 1985. The study shows that there were very few vacancies in ocean-oriented mobile home parks in Los Angeles and Orange Counties during the period for which the study was performed. However, this study does nothing to prove the City's contention. A low vacancy rate does not warrant the conclusion that a monopoly exists because most transfers of tenancy are made without a "vacancy" ever occurring. Coaches are seldom moved. They are sold to the next tenant. Thus, the vacancies shown have little or no evidentiary value in determining this factual issue.

If coach sales are used as the determinant of housing availability, the picture is markedly different. A report prepared for the Point Dume Club shows that from the years 1986 to 1991, the yearly turnover rate never dropped below seven percent, and during 1989 actually reached eighteen percent. [Plaintiffs' Exhibit 8, at 60]. Thus, the actual data shows that in fact there was no housing shortage in the mobile home market. Furthermore, the studies relied upon by the City show that the rentals in both Malibu parks were priced below market.

Moreover, the City has not shown that the park owners possess any more of a monopoly than any other property owner has over the particular property it owns. In order to show that a park owner has a monopoly, the relevant market has to be defined so narrowly as to reach the point of absurdity. A mobile home is only one of a large variety of housing options available in Southern California and a number of mobile home parks exist throughout this area. Thus, whether the market is defined as housing or more narrowly as mobile home housing, the tenants have a number of options. Even if the Court were to limit the market to mobile home parks in Malibu, there are two competing parks. The City has made no allegation that the park owners are in collusion with one another to raise the rents in the parks. In-

7. Moreover, the zoning ordinance, by disallowing the operation of any more mobile home parks within the City of Malibu, adds to the problem allegedly addressed by the rent control ordinance. Although it is the City Council's role, not the Court's, to balance the competing interests of maintaining the low density character of Malibu and the need for more mobile home housing, it seems unfair for the City to require the very citizens who have acted to provide mobile home housing pay for a housing shortage created in part by the actions of the City Council itself. The unfairness of this result is only compounded by the City's failure to do any real study of the mobile home market in Malibu.

deed, the evidence shows that the rental rates are substantially lower at Paradise Cove than they are at Point Dume. Such a disparity suggests that the owners of the two parks are operating independently. It is only if the relevant market were to be defined as an individual park that a monopoly would exist. Since such a market definition would render every piece of rental property a monopoly, the Court does not find it viable.

Nonetheless, the relative positions of the parties does, in a very limited way, put the landlord in a superior bargaining position. The mobile home tenant makes a substantial investment in the coach whether he buys the coach in place or purchases it prior to placement. Many mobile home park tenants also make substantial improvements to their spaces giving them an economic incentive to stay where they are. Moreover, like all tenants, many mobile home tenants have a non-economic investment in remaining in place. Such non-economic factors include social relationships in the community, familiarity with the location, nearby employment, and a variety of other considerations. The Court accepts that a tenant may have both an economic and non-economic investment in remaining in place and that this investment may place the park owner in a somewhat superior bargaining position to that of the tenant. This superior bargaining position, however, is not created by any monopoly held by the park owners, but instead by the unprotected nature of the tenants' investment. Accordingly, it supports the City's second stated purpose, not its first.

As a final point with respect to the issue of the monopoly allegedly created by the shortage of space, it is evident that if a shortage existed before, the City, by enacting the zoning ordinance, has taken steps to make it worse and to make it permanent. The zoning ordinance forbids the creation of any new mobile home parks within the City, effectively locking in for the foreseeable future whatever shortage now exists.

■ The second purpose identified by the City is to protect the investment that the tenants make in their mobile homes. Although the park owners agree that the tenants do make an investment in their homes, they dispute that that investment needs protection, pointing to the escalating prices that the tenants have been receiving upon the sale of their coaches. The evidence is uncontroverted that sales prices for coaches in the parks consistently increased during the years prior to the imposition of rent control. Nevertheless, if the City reasonably determined that the possibility existed that the tenants' investments were threatened, it might be justified in taking steps to protect them. *Pennell*, 485 U.S. at 12–13, 108 S.Ct. at 857–58 (holding that the government may intervene in the marketplace to protect consumer welfare).

The dynamic relationship between the sales price of the coach and the amount of the rent suggests that the City's second stated purpose is not only its central one, but is in reality its only one. From the standpoint of a prospective buyer with a set amount of money to pay for a coach, the lower the rent he must pay, the more money he will have left over to dedicate to the mortgage on the coach. Accordingly, as the rent goes down, the sales price for the coach invariably goes up because the buyer is willing to pay more to the coach owner in consideration of the improvements as well as the low rent. In Malibu, this effect is demonstrated by higher sales prices for coaches at Paradise Cove, which has lower rents, than at Point Dume, even though Point Dume has superior amenities.

However, to speak of the transfer of tenancy as simply a sale of the coach is a mischaracterization. In fact, what the departing tenant sells and what the incoming tenant buys is a package consisting of the coach, the improvements put in place by previous tenants and that element of value inherent in the location of the coach ("placement value") which is possessed by the departing tenant.[8] The placement value is affected by view, amenities, the overall desirability of the area in which the coach is located, market rates

---

**8.** For a detailed discussion of the concept of placement value see Hirsch & Hirsch, *supra* note 2, at 426–33.

for surrounding property, and a variety of other elements. This element of value is roughly equal to the amount of the purchase price in excess of the value of the coach and the improvements.

The coach and the improvements are depreciating properties. Thus, in Malibu, where prices for coaches in place have only escalated, the placement value makes up a substantial, if not the dominant, element of the purchase price of a coach upon a change in tenancy.

The park owner also realizes a portion of the placement value through the rent and upon selling the land. The more desirable the location of a coach, the more a prospective tenant would be willing to pay to live there. Thus, theoretically, if the park owner places the rent at a level high enough that the tenant can realize upon the transfer of his tenancy only the depreciated value of the coach and the improvements, the park owner would receive all the placement value. If the rent is set below that level, the tenant, correspondingly, receives a portion of the placement value which is realized upon the transfer of that tenant's tenancy. Accordingly, rent control in the mobile home market effects an adjustment of the allocation of placement value.[9] Whether the City has the power to adjust this shared allocation of placement value is the central question in this case and resolution turns on how the economic relationship between the park owners and the tenants is viewed.

The City argues that the return the tenant receives upon the sale of the coach is a legitimate investment based return. Thus, the City views placement value as an item of property shared by the park owners and the tenants. Indeed, the escalating sales prices in the Malibu parks evidence that, historically, the park owner and the tenants have shared the placement value.

In contrast, the park owners argue that the tenants own nothing but the coach, which is a depreciating property, and that any placement value, because it arises from the location of the park owner's real property, belongs solely to the park owner. Any value received by the departing tenant, beyond the depreciated value of the coach and the improvements, according to the park owners, rightfully belongs to the park owners. The park owners' position, in effect, is that placement value is a distinct item of property, no portion of which has ever been transferred to the tenants. The park owners' realization of this placement value is reflected in the rent charged for the space, and as the value increases, the rent must be increased to capture this value. The park owners' position, taken to its logical conclusion, is that they must have an unrestricted right to increase rent, or they lose this "right" to placement value. Under this argument, rent control transfers this item of property to the tenants and is therefore unconstitutional.

The problem with the park owners' position is that placement value has always been shared between the park owners and the tenants. Accordingly, rent control is more properly viewed as an allocation of shared value rather than as a transfer of rights. It is clear that most, or even all, of the tenants have invested more than the value of the coach itself to move into the park. New tenants have paid for placement value held by previous tenants. Therefore, the tenants have an expectation that they will be able to substantially recoup that investment upon the sale of the coach. While that expectation may not be altogether wise, it is not unreasonable. The park owners are business people who understand that the operation of a mobile home park involves an economic relationship in which both the park owner and the tenant must make a substantial investment. Indeed, they have encouraged the tenants to make the investment and to expect a return on it.

The park owners point out that the primary beneficiaries of the placement value

---

9. Rent control also reduces the risk inherent in an investment in a mobile home tenancy. Therefore, if rent control is in place, because the investment is protected, the tenant would theoretically receive a higher price as a result of the reduction of that risk. However, because the reduction of risk represents nothing more than security in the tenant's proportionate stake in the placement value, any adjustment in the risk is a sub-element of the general adjustment of placement value effected by rent control.

transferred by the ordinance are the tenants in place at the time the ordinance is enacted. Subsequent tenants pay a premium to current tenants for that value and receive the benefits of potential increases in placement value only to the extent that it exceeds the rent increases allowed under the ordinance. However, this one-time benefit to the current tenants is purely incidental, and except in the case of the rollback provisions, does not give the current tenants any more of the placement value than they already had before the ordinance was enacted. If the tenants do receive an increase in value, it arises from a reduction of risk, which is an unavoidable consequence of any effective strategy to achieve the City's investment protection purpose.

Without regulation, the park owners do have the power to seriously diminish the value of the tenants' investments by imposing arbitrary increases in rent. This might not be true if the market were perfect and the park owners were perfectly rational. However, there is no perfect market, and the perfectly rational economic actor is nothing more than a theoretical construct. While the evidence does not support the total market failure argued by the City, the Court must conclude that protection of the tenants' investment to some degree is a legitimate interest of the City. *Pennell*, 485 U.S. at 13, 108 S.Ct. at 858. Were the situation one in which the park owners and the tenants had not historically shared this value, the park owners' argument might be more convincing. However, in light of the substantial history of shared value in the Malibu parks, the Court must conclude that the rent control ordinance has the effect of adjusting value rather than transferring rights.

■ The City's third stated purpose is to protect low-income tenants. The parties dispute the number of low-income tenants in the plaintiffs' parks, but both the plaintiffs and the City admit that the mobile home park population is wealthier than the average such population. The evidence presented does show, however, that there are some low and fixed income residents in the plaintiffs' parks. Because there are some tenants in the parks with low or fixed incomes, the City has a

legitimate interest in protecting them. The incidental benefit to wealthier tenants does not invalidate that purpose.

■ The final purpose expressly identified by the City is to reduce the return of the park owners to the constitutional minimum. An ordinance that effects a transfer of wealth is not per se unconstitutional. *Yee v. City of Escondido*, —— U.S. ——, ——, 112 S.Ct. 1522, 1529, 118 L.Ed.2d 153 (1992). However, absent some other justification, the City does not have a legitimate government interest in effecting such a transfer. While the constitution allows the government to enact regulations that have an adverse effect on the income of particular citizens if the regulations promote a legitimate government interest, the reduction of the park owners' income is not, of itself, a legitimate government interest.

### 2. Is the Rent Control Ordinance Rationally Related to any Legitimate Purpose?

Constitutional analysis of the ordinance also requires that the Court determine whether the rent control ordinance is rationally related to the two legitimate purposes identified above. Here also, the Court must analyze not only the constitutionality of the individual elements of the rent control ordinance, but also of the regulatory scheme created by the rent control ordinance and the zoning ordinance.

#### a. *Rent increase limits*

■ The City has a legitimate interest in protecting the tenants' investments in the coaches, improvements, and location. These investments could be substantially eroded by arbitrary rent increases imposed by the park owners. The rent increase limit protects the tenants' investment by limiting the landlord's power to force the tenant out of the park by increasing the tenant's rent to a level which he can no longer pay. The provision also operates to stabilize the resale value of the tenant's coach by reducing uncertainty regarding the amount of rent necessary to remain as a tenant over a long period of time. The rent increase limits also operate to protect low and fixed income tenants.

### b. *Rent rollback*

■ Rent rollbacks and rent freezes have generally been upheld if they counteract rent increases imposed by landlords in anticipation of rent control. See, *e.g., Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 130 Cal.Rptr. 465, 491–94, 550 P.2d 1001, 1027–30 (1976). It is indisputable that the eight year rollback imposed by the Malibu ordinance does not serve that purpose. During the first six years of that period, Paradise Cove was subject to the Los Angeles County rent control ordinance. Although Point Dume was exempt from that ordinance, the rent rollback is largely inapplicable to Point Dume because most of its tenants were under long term leases. During that six year period, the park owners could not possibly have anticipated the enactment of a rent control ordinance because the City had not yet been incorporated. During the final two years, the parks were subject to the City's rent moratorium. Consequently, they could not have raised the rents in the parks in anticipation of the ordinance.

In fact, the legislative record of the City's ordinance presents persuasive evidence that the rent rollback was motivated by the City's desire to punish Kissel for what it perceived to be violations of the Los Angeles County ordinance prior to the City's incorporation. [Transcript, City Council Meeting, February 25, 1992, Legislative Record, at 331–405].

The City argues that it was rational to roll the rents back to 1984 levels to adjust for any excessive increases in the period when the Los Angeles County ordinance was in effect. However, the City Council made no inquiry into whether there had actually been any excessive rent increases prior to the imposition of the rent moratorium. The City relied solely on evidence that some residents of Paradise Cove had complained to Los Angeles County about rent increases. The County had not investigated the claims, so the City had no basis to conclude that they were valid. Indeed, more than one hundred residents of Paradise Cove opposed the rollback because they believed that their rents were not excessive.

Neither does the evidence support the conclusion that the rollback was needed to protect the tenants' investments against any action by the park owners. The evidence is uncontroverted that the tenants were selling their coaches at substantial premiums throughout the period subject to the rollback. Although the City may enact controls in order to protect the tenants against future increases that could threaten their investment, it cannot decrease rents with absolutely no evidence that rents had ever been increased to arbitrary levels.[10] Likewise, the rollback does not affect any power disparity that exists between the park owners and the tenants. If there is a power disparity, it is the park owners' power *to raise* the rent that creates the disparity, not the *amount* of the rent itself. The eight year rollback provision is wholly arbitrary and punitive, and is therefore violative of the Due Process Clause of the Fourteenth Amendment.

### c. *Rent freeze until March 28, 1993 and following long-term leases*

■ Like the rent rollback, the three year moratorium imposed by the rent control ordinance at the end of long term leases and the freeze on increases until March 1993 are violative of the Due Process Clause because they do not bear a rational relationship to the legitimate purposes for which the ordinance was enacted. Once again, the City had no evidence of arbitrary rent increases and did no market study. Furthermore, the freezes, like the rollback, do not advance the legitimate interests which the City claims it had for enacting the ordinance. Also, like the rollback, the rent freeze on long term leases was at least partially motivated by a desire to remedy increases made under Point Dume leases allegedly entered into by tenants as a result of coercion by Adamson. [Transcript, City Council Meeting, February 25, 1992, Legislative Record, at 331–405]. However, the City had no evidence that there was coercion or that the rents in the parks were actually excessive. Therefore, although it was permissible for it to regulate potential increases in order to prevent the rents from

---

**10.** To the extent that the City acted to penalize Kissel for alleged rent increases in violation of the Los Angeles County ordinance, it was acting in pursuit of an impermissible interest.

*becoming* excessive, the City had no justification to freeze rents at current levels for substantial periods without evidence that they were *in fact* excessive.

Moreover, because the rent moratoriums last for a significant period of time with no reasonable adjustment mechanism, they cannot withstand constitutional scrutiny. Although the ordinance theoretically allows the park owner to escape the moratoriums by applying for a rent increase, to obtain such an increase the park owner would have to show that the park, as a whole, was not affording it a reasonable return on its investment. The rent control ordinance permits a park owner to apply for an increase on one, some or all of the spaces within the park, but it allows an adjustment from the *base rate* only if the park owner can show that the park owner's operating, maintenance or other expenses were unusually high or low in the base year. Rent Control Ordinance § 6708 C. & 6712 C.[11] For a space that was previously subject to a long term lease, the base rate is the rent at the time the lease expires. Rent Control Ordinance § 6701 B. For a space not subject to a long term lease, the base rate is the rent charged on December 31, 1984 as adjusted according to the terms of the Los Angeles County ordinance until the effective date of the rent control ordinance. Rent Control Ordinance § 6701 B. Consequently, the freeze provisions apply to the base rate itself. Under the ordinance, the base rent is presumed to provide a fair and reasonable return. Rent Control Ordinance § 6712 B. That presumption can only be rebutted by a showing that the park, *as a whole*, was subject to unusually high or low expenses. Rent Control Ordinance § 6712 C. As a result, the park owner is effectively disabled from obtaining an increase after the termination of a lease barring some kind of park-wide crisis.

Since both the two year moratorium following the passage of the rent control ordinance and the three year freeze following the termination of the lease leave the park owner without a remedy should it be denied a fair return on its investment, both violate the Due Process Clause of the Fourteenth Amendment. *See Birkenfeld,* 130 Cal.Rptr. at 494, 550 P.2d at 1030 ("For such rent ceilings of infinite duration an adjustment mechanism is constitutionally necessary to provide for changes in circumstances and also provide for the previously mentioned situations in which the base rent cannot reasonably be deemed to reflect general market conditions.").

### d. *Rent moratorium while the City considered the rent control ordinance*

Conversely, the three year rent moratorium applied by the City Council while it was considering the rent control ordinance is presumptively valid. That moratorium could have achieved the legitimate purpose of limiting increases in reaction to the possibility of impending rent control. The Court notes, however, that the City does not have the power to continue the moratorium indefinitely. A time must come when a moratorium has lasted so long as to violate due process.

### e. *Vacancy control*

The dispute regarding the characterization of the relationship between the mobile home tenant and the park owner becomes most sharply focused in the area of vacancy control. In enacting the vacancy control provision of the ordinance, the City has in effect allocated a large part of the placement value of the coach to the tenant rather than to the park owner, thus raising serious constitutional questions. As discussed above, the park owners argue that any placement value arises from the value of the land and consequently belongs entirely to them. The City argues that the placement value is a legitimate part of the package sold to the tenants by the park owner when the park owner offers the space. The reality is somewhere between the two approaches.

Both the plaintiffs and the City argue from the assumption that each tenant buys a coach, finds a vacant space and places a coach in the space. The evidence clearly

---

**11.** The base rate can be adjusted for an individual space only if it is the result of a lease provision that provided for variable rents throughout the time of the lease, a seasonal variation or because of a special circumstance such as a rebate or the pass-through of a capital improvement.

shows that that rarely happens, and that if it happens at all, it does not happen in the Malibu parks.[12] What *actually happens* is that the tenant buys an existing coach in place in a particular park and *pays the departing tenant a premium* over the depreciated value of the coach. That payment of a premium for the placement value of the coach predated rent control. Thus, the park owners contemplated from the outset that the tenants would receive some return for the placement value of the coach. Because in almost every case the tenant has himself paid a placement premium as part of his own original investment, the tenant suffers economic injury if the park owner increases the rent to a level that seriously diminishes the tenant's investment or eliminates it altogether.

As stated above, the park owners argue that the tenants should have known when they entered the relationship that their investment was at risk and that the City is not justified in helping them avoid a risk they voluntarily assumed. This *caveat emptor* argument is not compelling. Regardless of the wisdom of the tenants' decisions to live in the parks, the City has the power to legislate to protect the tenants' investments. Without vacancy control, the park owner could force existing tenants to sell the coach-in-place at "distress-sale prices." *Azul Pacifico, Inc. v. City of Los Angeles*, 948 F.2d 575, 583 (9th Cir.1991), *op. withdrawn, on reh'g appeal dismissed*, 973 F.2d 704 (9th Cir.1992). By enacting the vacancy control provision, the City favored the tenants' share of the placement value over the park owners'. However, it is within the City's power to adjust the balance of competing investment backed expectations for the purpose of protecting consumer welfare, and in doing so, it may make a choice which favors the tenants' investment over that of the park owners. The vacancy control provision of the rent control ordinance does not, by itself, violate substantive due process.

#### f. *Closure/Conversion restrictions*

■ In their present form, the closure conversion restrictions require that a park owner contemplating closing park property or converting it to another use prepare a report detailing the impact of the closure or conversion on the residents of the park. The report is submitted to the planning department, or another agency designated by the City Council, which then recommends mitigation measures. This procedure is rationally related to protecting the tenants' investments in their coaches and in their spaces and is not violative of the park owners' constitutional rights.

#### g. *Pass-through and fair return provisions*

■ The ordinance states that its provisions are intended to assure that the park owners receive a fair return on their investment. The park owners have not submitted any evidence that the pass-through provisions do not advance that legitimate interest. The park owners argue that the pass-throughs merely maintain the status quo by allowing the park owners to pass certain costs on to the tenants, and are not a method for increasing the rent. However, the fact that the pass-through provisions do not provide the park owners with a method for increasing the rent does not necessarily lead to the conclusion that they do not advance the purpose of assuring the park owners a reasonable return. The pass-through provisions of the ordinance do not violate due process.

■ However, the park owners argue persuasively that the procedure adopted by the ordinance to adjust the base rate in order to assure a fair return is too restrictive. The ordinance allows the park owner to apply for a rent increase from base rent only if "[t]he park owner's operating and maintenance expenses in the base year were unusually high or low in comparison to other years," or the rent on the base date was disproportionate because it was artificially high or low due to

---

**12.** At the evidentiary hearing, plaintiffs' expert witness testified that at least one buyer bought a coach in place and then subsequently had it removed and replaced. No evidence was introduced that anyone in recent years has ever rented a vacant space in a Malibu park. In fact, the City strenuously argued that the Malibu parks had a zero vacancy rate.

a lease provision, a seasonal variation, or some special circumstance. Rent Control Ordinance § 6712. The park owner is given no recourse for changes due to other economic conditions or occurrences during the eight year period between 1986 and the date the base rate took effect in 1992. The effect of this narrow procedure is that the park owner is not allowed to adjust the base rent to a level that provides it a reasonable return under all circumstances. Consequently, it violates the Due Process Clause of the Fourteenth Amendment.[13]

### h. *The regulatory scheme as a whole*

In addition to examining the individual elements of the rent control ordinance, the Court must analyze the overall effect of the rent control ordinance taken together with the zoning ordinance to determine whether the rent control ordinance is reasonably related to a legitimate purpose.

As stated, it cannot be disputed that the rent control ordinance severely limits the park owners' return on their property, and that it, in combination with the zoning ordinance, makes a change in the use of the park owners' property virtually impossible. Both ordinances require that a park owner obtain the approval of the City Council prior to changing the use of the property. That such an application would be futile is without question. The City Council has demonstrated its clear intention to favor the continued operation of the parks regardless of the impact upon the park owners. The question for the Court, then, is whether the City's requirement that the park owners continue to operate the parks for a return close to the constitutional minimum in perpetuity is arbitrary, discriminatory[14], or demonstrably irrelevant to a legitimate government purpose. *Pennell,* 485 U.S. at 11, 108 S.Ct. at 857.

In considering whether this onerous regulatory scheme is *rationally* related to the

interests it is intended to promote, the Court cannot conclude that there is evidence of the kind of market failure that the City envisions. If there were, perhaps all of the burdens placed on the park owners would be justified. On the contrary however, the evidence shows that prior to the adoption of the ordinance, the tenants were selling their coaches in place for substantial and escalating premiums, that throughout the period prior to the adoption of the rent control ordinance, numerous coaches were sold, and that the rents in the parks were actually below market rates for comparable oceanside parks. Accordingly, although some of the interests advanced by the rent control ordinance may be legitimate, the Court is hard pressed to find that a regulatory scheme that so severely interferes with the park owners' economic rights is rationally related to those interests.

Under the regulatory scheme, the park owners are effectively denied any opportunity to change the use of their land. Although the City has written the ordinance in a way that shields this aspect of it from facial challenge, it is clear to the Court that a change of use is not a viable option for the park owners. The park owner must first prepare a report, submit it to a committee and agree to provide whatever mitigation measures the committee recommends. Then, the park owner must obtain the consent of the City Council to close the park. Then, even if the City Council were to agree to the closure, the zoning ordinance would deny the park owner any change of use without further consent by the City Council.

Because there is virtually no evidence that the park owners were abusing any power that they have over the tenants, it is difficult to conceive of any reason for the enactment of such an onerous ordinance other than a desire to please the current tenants of the parks, a large and very vocal voting constitu-

---

**13.** The ordinance includes a "savings clause" that reads "[n]othing in this chapter shall be construed to prevent the grant of a rent adjustment upon application by a park owner when required to permit a fair and reasonable return to the park owner...." Rent Control Ordinance § 6721. This savings clause does nothing to remedy the constitutional problem with the pro-

cedure for setting base rents. The City cannot enact a statute with very narrow requirements and then, by means of a boilerplate clause, assure the constitutionality of all its procedures.

**14.** Whether the enactment is discriminatory is discussed under the heading of equal protection.

ency in the City. These current tenants, of course, stand to benefit from the ordinance in the form of higher sales prices for their coaches.[15]

■ However, the Court is required to give deference to the City Council's determination of the appropriate way to protect the tenants' investments. The Court may not invalidate the ordinance based on a suggestion of an improper motivation on the part of the City Council when a proper motivation is also presented. *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."). Likewise, the Court is not permitted to speculate as to the future actions of the City Council should the park owners later desire to close the parks. Because the City Council could rationally have found that the ordinance strikes an appropriate balance between the investment expectations of the tenants and those of the park owners, the Court finds that, with the exceptions noted, the regulatory scheme established by the rent control ordinance and the zoning ordinance does not violate the Due Process Clause of the Fourteenth Amendment.

### B. *Equal Protection*

■ The plaintiffs assert that the rent control ordinance denies them their rights under the equal protection clause. Most laws distinguish in some fashion between classes of persons, and the equal protection clause does not forbid classifications. *Nordlinger v. Hahn*, — U.S. —, —, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). Rather, the clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* As a general rule, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *Mc Gowan*

*v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Accordingly, unless a classification warrants some sort of heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the equal protection clause requires only that the classification rationally further a legitimate government interest. *Nordlinger*, — U.S. at — – —, 112 S.Ct. at 2331–32.

■ Although the plaintiffs do not identify precisely what classification made by the ordinance they claim violates the equal protection clause, the Court assumes that they challenge the City's choice to apply controls only to mobile home rentals rather than to all residential rentals. Since such a classification does not involve any suspect category, the Court reviews it for rational relation to a legitimate interest. *Nordlinger*, — U.S. at — – —, 112 S.Ct. at 2331–32.

Were the ordinance only intended to protect low income residents, it would present severe concerns under the equal protection clause. First, it would arguably be overbroad because it protects a substantial number of wealthy park tenants in order to protect only a few low income tenants. It would also arguably be unconstitutionally underinclusive because it fails to protect low income apartment dwellers. The ordinance is saved, however, because one of the explicit interests advanced by the enactment of the rent control ordinance is the protection of the investments made by the tenants. Because other residential tenants do not make an investment of the kind involved in a mobile home, the City must be found to have acted rationally when it chose to apply rent control only to mobile home tenancies.

### C. *Taking Without Just Compensation*

■ The Fifth Amendment to the United States Constitution requires that private property not be taken for public use without just compensation. United States Constitu-

---

**15.** This benefit is actually paid to the tenants by future tenants. Consequently, the ordinance, as enacted gives a one-time bonus to the tenants living in the park at the time it takes effect. This one-time benefit also conflicts with the City's rationale regarding the protection of low income tenants because, after the end of the initial tenancy, it is unlikely that any low income tenant could ever become a resident of either park.

tion, Amend. 5.[16] Most of the cases interpreting the Takings Clause fall within two distinct categories. *Yee v. City Of Escondido Cal.,* —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992). Where the government authorizes a physical occupation of property, or actually takes title, the Takings Clause generally requires compensation. *Id.* Alternately, where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. *Id.* The plaintiffs argue that the rent control ordinance taken together with the zoning ordinance effects a taking under both theories.

The plaintiffs do not challenge the ordinances as they apply to their particular property and circumstances, but rather mount a facial challenge to the ordinances. They argue that the ordinances constitute a taking however they might be applied. Before reaching the merits of this claim, the Court first must confront the City's argument that the plaintiffs' facial takings claims are not ripe for adjudication.

1. *Ripeness*

The City takes the position that the plaintiffs' takings claims are not ripe for adjudication because plaintiffs have not pursued all available state remedies to secure just compensation. Plaintiffs respond that although a challenge to a particular application of an otherwise constitutional statute might not be ripe, their facial challenge to the ordinance presents a controversy ripe for adjudication.

The Supreme Court has held that before a property owner can make a challenge to the *application* of an ordinance, he must exhaust both administrative remedies under the applicable ordinance and any remedy provided in the state courts that could lead to the provision of just compensation. *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985). The Supreme Court addressed the ripeness requirement for a *facial* taking in *Yee v. City of Escondido, Cal.,* —— U.S. ——, ——, 112 S.Ct. 1522, 1532, 118 L.Ed.2d 153 (1992). In *Yee,* the Court held:

> While respondent is correct that a claim that the ordinance effects a regulatory taking *as applied* to petitioners property would be unripe ..., petitioners mount a *facial* challenge to the ordinance. They allege in this Court that the ordinance does not 'substantially advance a legitimate state interest' no matter how it is applied. As this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe.

*Yee,* —— U.S. at ——, 112 S.Ct. at 1532 (emphasis in the original and citations omitted).

Moreover, the Supreme Court has reached the merits of facial takings claims on numerous occasions without questioning ripeness. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (upholding Pennsylvania statute forbidding coal mining that causes subsidence to pre-existing structures); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73

---

**16.** Adamson's inverse condemnation claim is resolved here in conjunction with the plaintiffs' federal takings claims. In the context of takings by regulation, the prohibition against uncompensated takings under the California Constitution has been interpreted by the California courts to be narrower than that imposed by the United States Constitution. *Agins v. Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979), *affirmed on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (holding that there

is no right to monetary compensation for a regulatory taking in an inverse condemnation action); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (overruling the California Supreme Court's Decision in *Agins* ); 7 H. Miller & M. Starr, California Real Estate 2d § 23.18. More recently, California cases have applied federal takings principles to resolve California inverse condemnation claims. *E.g., Twain Harte Assoc. v. County of Tuolumne,* 217 Cal.App.3d 71, 265 Cal.Rptr. 737 (1990).

L.Ed.2d 868 (1982) (holding the installation of CATV facilities on plaintiff's property to be a physical taking); *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (denying facial challenge to the Surface Mining Act); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (upholding zoning ordinance against facial challenge).

In *Hodel,* the Supreme Court first held that § 522(e) of the Surface Mining Act was not a facial taking, and then went on to hold that because the plaintiffs had failed to identify any particular property that had been taken under the Act, an "as applied" challenge was not yet ripe:

> Although we conclude that 'mere enactment' of the Act did not effect a taking of private property, this holding does not preclude appellees or other coal mine operators from attempting to show that as applied to other parcels of land, the Act and the Secretary's regulations effect a taking.

*Hodel,* 452 U.S. at 297 n. 40, 101 S.Ct. at 2371 n. 40.

In *Keystone,* the Supreme Court stated:

> The posture of this case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation.

*Keystone,* 480 U.S. at 494, 107 S.Ct. at 1246. Although the Supreme Court recited a long passage from *Hodel* emphasizing the necessity for a concrete controversy before a takings claim could be examined, it nonetheless went on to decide that there had been no facial taking. *Keystone,* 480 U.S. at 501–02, 107 S.Ct. at 1250–51.

Clearly, the Supreme Court contemplates that a facial takings challenge can be adjudicated prior to the exhaustion of all state remedies provided that a concrete controversy exists between the parties. *See, e.g., Lucas v. South Carolina Coastal Council,* — U.S. ——, —— n. 4, 112 S.Ct. 2886, 2907 n. 4, 120 L.Ed.2d 798 (1992) (Blackmun J. dis-

senting) ("Facial challenges are ripe when the act is passed; applied challenges require a final decision on the act's application to the property in question."). Moreover, the discussion of the issue in *Yee* suggests strongly, in a factual situation nearly identical to the present case, that a facial challenge such as the one involved here is ripe for adjudication.

The City attempts to distinguish the ripeness discussion in *Yee,* arguing that because *Yee* came to the Supreme Court from the California state courts, the Supreme Court could decide whether there was a taking while remanding the issue of just compensation to be decided by the state courts. This Court finds that while *Yee* did follow a different procedural path than the present cases, the Supreme Court's discussion of ripeness in *Yee* is nonetheless useful to demonstrate that the Supreme Court continues to require a lower standard for the ripeness inquiry for facial challenges.

The City further argues that the Ninth Circuit requires the *Williamson* test to be satisfied for both as applied and facial takings challenges. The Ninth Circuit's construction of *Williamson* is not entirely clear. In *Lake Nacimiento Ranch Co. v. San Luis Obispo Cty.,* 841 F.2d 872 (9th Cir.1987), *cert. denied,* 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988), the Ninth Circuit set out different standards for facial and "as applied" takings challenges. According to *Lake Nacimiento,* in order for an as applied challenge to be ripe, a plaintiff must establish two components: (1) that the regulation has gone so far that it has "taken" plaintiff's property; and (2) that any compensation tendered for such taking is not just. *Lake Nacimiento,* 841 F.2d at 877. However, *Lake Nacimiento* held that a facial challenge was ripe because it was brought on the basis that the mere enactment of the restriction constituted a taking. *Lake Nacimiento,* 841 F.2d at 877.

Later, the Ninth Circuit, although acknowledging that the Supreme Court has often decided facial takings claims without considering ripeness, decided that facial takings claims are not ripe "unless and until it is known what, if any, compensation is available." *Southern Pacific v. City of Los Ange-*

*les,* 922 F.2d 498, 505–06 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). *Southern Pacific,* however, did not purport to require that all facial takings challenges must meet that test, but rather established an exception where "the court is simply considering whether a taking has occurred, not whether it is a taking without just compensation," or where "no compensation would be sufficient to cure the constitutional infirmity." *Southern Pacific,* 922 F.2d at 506–07 n. 11.

The City argues that *Southern Pacific* distinguishes the Supreme Court cases that reach the merits of facial takings claims in two ways. The first group of cases, according to *Southern Pacific,* were ripe despite no prior determination of just compensation because they had come up from state courts and the Supreme Court could remand for a determination of just compensation. *Southern Pacific,* 922 F.2d at 506 (distinguishing *Agins* and *Loretto*).[17] The City's argument appears to be that *Southern Pacific* distinguishes the second group of cases, (*Hodel* and *Keystone*), on the ground that, because the Supreme Court held that there had been no facial taking, it was not necessary to determine the amount of just compensation. This argument is flawed because it distinguishes the ripeness determination based on the result on the merits. Although somewhat broader in scope than the strict limits of Article III case and controversy jurisdiction, ripeness is, at its base, a jurisdictional

determination. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976).[18] Jurisdiction is a threshold consideration which is not based on the outcome of the merits of the case. Likewise, the prudential elements of the ripeness doctrine cannot be based on a predisposition of the merits. Yet, the City's argument leads inexorably to the conclusion that the Court has jurisdiction if there has been no taking, but does not if there has been a taking. That interpretation of the holding in *Southern Pacific* is so at odds with the entire system of federal jurisdiction that it cannot be accepted here.

Rather, if interpreted narrowly, the holding of *Southern Pacific* can accommodate the Supreme Court's decisions in *Hodel* and *Keystone.* The facial takings issues in *Hodel* and *Keystone* were ripe for determination, not because the Court ultimately determined that there was no taking, but rather because the Supreme Court was presented with a sufficiently concrete factual setting in which to decide the question of what compensation would be appropriate.[19]

This Court interprets *Southern Pacific,* in accord with Supreme Court precedent, to hold that a facial challenge is ripe if to determine whether there is a taking would not require the Court to speculate regarding what property was taken by the regulation. "[T]he constitutionality of statutes ought not to be decided except in an actual factual setting that makes such a decision necessary." *Hodel,* 452 U.S. at 294–95, 101 S.Ct.

---

**17.** *Yee* would arguably fall into this category.

**18.** The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. *Pacific Gas & Electric v. State Energy Conservation Comm'n,* 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).

**19.** The District of Hawaii has suggested that *Southern Pacific* should be interpreted to require a determination of available compensation prior to determination of whether a taking occurred only if the regulating governmental entity has made no indication as to the amount of compensation available and it would therefore be necessary to wait for such a determination before deciding whether there had been a facial taking. *Richardson v. City and County of Honolulu,* 759 F.Supp. 1477, 1483 (D.Hawaii 1991). *Richardson* was a challenge to an ordinance that limited

increases in renegotiated lease rents for residential condominiums according to the Consumer Price Index. *Richardson,* 759 F.Supp. at 1479. *Richardson* held that because the ordinance set forth a formula for determining the allowable increases, the amount of compensation available under the ordinance was not entirely unclear. *Richardson,* 759 F.Supp. at 1483. *Richardson* is ultimately unpersuasive, however, because the formula set forth by the statute does not set forth the amount of compensation available should the statute be adjudged a taking in an inverse condemnation action, but rather is only one factor in determining the amount of the taking itself. To determine just compensation, the Court would still have to establish a figure for market rent and then subtract the rent established under the formula from that figure, or otherwise determine what amount in addition to the allowable rent would constitute just compensation.

at 2370; *Pennell v. San Jose*, 485 U.S. 1, 10, 108 S.Ct. 849, 856–57, 99 L.Ed.2d 1 (1988).

*Southern Pacific* was a challenge to a zoning amendment that limited the uses to which the plaintiff's railroad right-of-way could be put. But, the plaintiff in *Southern Pacific* had never filed a meaningful development application. Consequently, the court had no means by which to determine how the plaintiff had intended to use the land. The claim was not ripe in *Southern Pacific* because the court could not determine, from the face of the ordinance, whether or not there had been a taking at all without resort to a specific record showing exactly what the plaintiff had been denied. In effect, what was presented to the court as a facial challenge to the ordinance could only be adjudicated "as applied." [20]

*Hodel, Keystone*, and the present case are distinguishable because the regulation under attack, rather than denying the plaintiff a hypothetical use, puts a set of specific limitations on the plaintiffs' present use of their property. In *Hodel* and *Keystone* the challenged statutes denied the plaintiffs access to certain coal reserves that they owned. The Supreme Court decided that there had been no facial taking based on a complete understanding of what property rights the plaintiffs were alleging they had been deprived of by the statute. Likewise here, the challenged ordinance limits the return on the plaintiffs' present use of the property, and the Court is not left to speculate regarding the plaintiffs' intended use of it. Plaintiffs' facial takings claims are ripe for determination.[21]

### 2. *Physical Taking*

 The government effects a physical taking only where it requires the land-owner to submit to the physical occupation of its land. *See*, —— U.S. at ——, 112 S.Ct. at 1528. "This element of required acquiescence is at the heart of the concept of occupation." *FCC v. Florida Power Corp.*, 480 U.S. 245, 252, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987). In *Yee*, the Supreme Court held that a mobile home rent control ordinance viewed in conjunction with the California Mobile Home Residency Law was not a physical taking. *Yee*, —— U.S. at ——, 112 S.Ct. at 1531. *Yee* overruled both a Ninth Circuit and a Third Circuit opinion holding that the vacancy control provisions of mobile home rent control statutes were physical takings. *Yee*, —— U.S. at ——, 112 S.Ct. at 1527 ("We granted certiorari to resolve the conflict between the decision below and those of two of the federal Courts of Appeals, in [*Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1987)] and *Pinewood Estates of Michigan v. Barnegat Township Leveling Board*, 898 F.2d 347 (3d Cir.1990).") [22].

The first argument advanced by the plaintiffs in *Yee* was that because the landlord cannot easily evict the tenant, the tenant receives what amounts to a perpetual right to occupy the landlord's property at below market rates. The Supreme Court held that there was no physical taking because "[p]etitioners voluntarily rented their land to mobile home owners." *Yee*, —— U.S. at ——, 112 S.Ct. at 1528. Responding to a similar argument in *Florida Power Corp.*, the Supreme Court commented, "it is the invitation, not the rent, that makes the difference." *Florida Power Corp.*, 480 U.S. at 252, 107 S.Ct. at 1112. Because the park owners invited the tenants onto their land, government regulation of the relationship between

---

**20.** In this sense, the situation presented by *Southern Pacific* is identical to that in *Williamson* itself. *Williamson*, like *Southern Pacific*, was a challenge by a landowner to a zoning restriction. It was against this factual background that the Supreme Court held, in *Williamson*, that the factors applied in deciding a takings claim "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will *apply* the regulations at issue to *the particular land in question."* *Williamson*, 473 U.S. at 191, 105 S.Ct. at 3119 (emphasis added).

**21.** However, the claims are ripe only to the extent that they do not involve any contemplated change of use.

**22.** *Yee* also effectively overruled *Azul Pacifico, Inc. v. City of Los Angeles*, 948 F.2d 575 (9th Cir.1991), *op. withdrawn, on reh'g appeal dismissed*, 973 F.2d 704 (1992), and *cert. denied*, —— U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993), which explicitly followed *Hall*.

the park owners and the tenants does not rise to the level of a physical taking.

The next argument advanced by the challengers to the rent control statute in *Yee* was that the restrictions on rental rates are realized by the tenant as an increase in the sales price of the tenants' coach. This increase would theoretically be accompanied by a corresponding decrease in the value of the park owner's land. This is different, according to the plaintiffs, from an ordinary apartment rental because the tenant has a valuable commodity to sell at the end of the tenancy. The Supreme Court responded that although this effect is more pronounced in the mobile home situation because it is realized all at once, all rent control effects a similar transfer of wealth. *Yee,* —— U.S. at ——, 112 S.Ct. at 1529. The Supreme Court held that "[t]he mobile home owner's ability to sell the mobile home at a premium may make this wealth transfer more *visible* than in the ordinary case, but the existence of the transfer in itself does not convert regulation into physical invasion." *Id.* (citation omitted, emphasis in the original). Moreover, as discussed above, the rent control ordinance is not the source of the tenant's premium. Most tenants buy a coach in place with an initial investment that includes some premium for the location of the coach. Consequently, although the rent control ordinance increases the in-place value of the coach, it does not create the situation in which the tenant takes some of that value. Rather, that situation is part of the package that the park owner sells to the tenants in the park either with or without rent control. The ordinance, to the extent that it effects a transfer, transfers value, not rights.

Plaintiffs argue that, despite *Yee,* the rent control ordinance has effected a physical taking because when combined with the zoning ordinance, it requires park owners to continue to use their land as a mobile home park in perpetuity. Their contention is that the zoning ordinance allows for no use other than as a mobile home park, and because of the conditions imposed by the rent control ordinance, they would never be able to find a buyer for a mobile home park with such a limited return or for any other use. The plaintiffs seize on the following language in *Yee:*

> A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating the tenancy.

*Yee,* —— U.S. at ——, 112 S.Ct. at 1529.

This argument is nearly identical to an argument made in *Yee* that "the statutory procedure for changing the use of a mobile home park is in practice 'a kind of gauntlet,' in that they are not in fact free to change the use of their land." *Yee,* —— U.S. at —— ——, 112 S.Ct. at 1528–29. The only difference is that the plaintiffs here contend that the statutory gauntlet is even tighter. Nonetheless, however tight the gauntlet, "it is the invitation, not the rent, that makes the difference." *Florida Power Corp.,* 480 U.S. at 252, 107 S.Ct. at 1112. The plaintiffs have issued the invitation, and, consequently, they cannot claim that the ordinances effect a facial physical taking.

The plaintiffs refer the Court to a decision in the Northern District of California which held that restrictions on the closure or conversion to other uses of residential hotels in San Francisco which required substantial costs for relocation of tenants constituted a physical taking. *Golden Gate Hotel Ass'n v. City and County of San Francisco,* 1993 U.S.Dist. LEXIS 9232, *modified,* 836 F.Supp. 707 and, *vacated on procedural grounds,* 18 F.3d 1482 (9th Cir.1994). *Golden Gate* held that the restrictions were physical takings because they had the effect of compelling the landlord to perpetually rent his property for a limited return. The court was disturbed by the fact that the ordinance in effect required the hotel owner to "pay a king's ransom in order to discontinue the use of his property as a residential hotel." *Id.* at *15–16.

While the Court agrees that such a requirement raises a substantial takings question, it cannot agree with the Northern District's conclusion that the challenged ordinance effected a *physical* taking. A regulation that promotes the continuation of an existing use does not normally effect a physical taking, even if it makes it substantially

more expensive to discontinue that use, because the property owner made the choice to use its property in the way prescribed by the regulation. Many regulations make changing the way a landowner uses his property more costly. Every zoning ordinance does so. Environmental laws, such as the National Environmental Protection Act, that require the preparation of reports and studies do so. The only difference, if any, between the ordinance at issue in *Golden Gate* and many other ordinances is the cost involved. That difference of degree, while it could support a finding that there was a regulatory taking, does not, in this Court's view, support a finding that there was a physical taking. The same reasoning applies to the rent control ordinance.

 The rent control and zoning ordinances, *as applied* to plaintiffs, might effect a physical taking, but the Court declines to consider that challenge because it is not ripe. It is undisputed that the plaintiffs have not made a change of use proposal,[23] nor have they requested any rent increases. They would have to do both as well as seek relief from the state courts prior to bringing an "as applied" challenge in the federal court. The plaintiffs argue that it would be futile to seek any redress from the City because the City has already indicated its intransigence, a conclusion with which the Court cannot disagree. Nevertheless, even if it is a foregone conclusion that the City would reject any request by the plaintiffs for a rent increase or zoning change, the Court still declines to adjudicate any "as applied" challenge. On this record, without some concrete definition of the scope of an intended change of use or rent increase by the park owners, the Court has no issue which it could decide.

### 3. *Regulatory Taking*

 In a regulatory taking case involving local government, the question is whether a diminution of value or transfer of rights caused by the local government was the result of an action justified by the police power or instead was the result of an action

that can be justified only by the power of eminent domain. *See Agins v. Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980); *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1280 (9th Cir.1986), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), and *overruled on other grounds, Yee v. City of Escondido*, —— U.S. ——, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). Under the Fifth Amendment as incorporated by the Fourteenth Amendment, just compensation is required only if the local government action is not within the legitimate scope of the local government's power. Accordingly, the Supreme Court has developed a test in the regulatory takings field that emphasizes the relationship between the action causing the diminution or transfer and the purpose of that action. Thus, an ordinance effects a regulatory taking if the ordinance does not substantially advance legitimate state interests or if it denies an owner economically viable use of his land. *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141.

 In order to determine whether the regulation denies the owner an economically viable use of his land, the Court is required to conduct inquiries and make evaluations concerning the economic impact of the regulation on the specific property involved. *Hodel*, 452 U.S. at 295, 101 S.Ct. at 2370. On a facial challenge such as the one now before this Court, there is no way to do that. The Court has only the ordinance itself, which is an insufficient basis for a determination that the owner has been deprived of all economically viable use of his land. It is enough for surmise perhaps, but not enough for a finding. Consequently, any claim that the rent control ordinance denies either Kissel or Adamson economically viable use of its land is not ripe for review.

This facial challenge, then, must be based on a contention that the rent control ordinance taken together with the zoning ordinance does not substantially advance a legitimate government purpose. Stated in a different way, this test requires that there must be a nexus between the regulation and the

---

**23.** There is some suggestion in the legislative record to the rent control ordinance that Kissel presented a development proposal for Paradise

Cove to the City Council, but that proposal is not in evidence.

purpose the government wishes to advance by means of the regulation. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, 107 S.Ct. 3141, 3148–49, 97 L.Ed.2d 677 (1987).

The analysis here is similar to the due process analysis above. Indeed, the Ninth Circuit has suggested that the due process standard of reasonable relation to legitimate purpose applies in the regulatory takings field as well. *Commercial Builders v. Sacramento*, 941 F.2d 872, 874 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992); *contra Azul Pacifico v. City of Los Angeles*, 948 F.2d 575, 582 (9th Cir.1991), *op. withdrawn, on reh'g appeal dismissed*, 973 F.2d 704 (1992), *and cert. denied*, —— U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993) ("But the Supreme Court has held that the relationship between the means and the ends must be closer for purposes of Takings Clause analysis [than for due process analysis]."). *Commercial Builders* held that the "substantially advance" test does not require scrutiny any stricter than rational basis. This Court doubts that the Supreme Court meant "rationally related" when it wrote "substantially advance," but because the rent control ordinance passes both tests, the Court need not consider the issue further.

■ The requirement that the ordinance substantially advance a legitimate purpose finds its practical application in the examination of whether a nexus exists between the function of the ordinance and the purpose the ordinance is intended to achieve. *Nollan*, 483 U.S. at 837, 107 S.Ct. at 3148–49. *Nollan* invalidated a building permit condition that required shoreside land owners to grant the public lateral access across their beach. *Nollan*, 483 U.S. at 837, 107 S.Ct. at 3148–49. The Court held that the requirement that the public be allowed to walk across the petitioner's property bore no relation whatsoever to the government's stated interest in promoting the public's ability to see the beach. *Id.* The Court invalidated the permit condition because it was intended to alleviate a different problem than that caused by the permit to which it was attached. *Id.*

■ The rent control ordinance acts directly to promote the legitimate interest pursuant to which it was enacted. Each part of the ordinance not invalid on due process grounds materially advances the goal of protecting the tenants' investment. The logical discontinuity between the purpose and the restriction that was present in *Nollan* is not presented by the City's rent control ordinance.

Rather, the problem with the rent control ordinance is that it is far more onerous than necessary to solve the problem that it set out to address. No matter how onerous it is, however, it is not overbroad in the constitutional sense of encompassing persons or behavior not related to its purpose.

Likewise, the incidental windfall received by the tenants in possession at the time the ordinance was enacted does not support a finding that the ordinance is a taking. That windfall is substantially related to the City's interest in giving buyers security as to what their future rent will be when they assume their tenancy. That the City may act to adjust the balance of the economic relationship between the park owners and the tenants is clear, and the windfall received by the initial tenants must be viewed as incidental to that adjustment. The timing of the adjustment is fortuitous. Since it is within the City's power to make such an adjustment, the incidental effect of a greater benefit to the initial group of tenants does not affect the validity of the ordinance because the later tenants also share the enhanced investment security that the ordinance was intended to create. The plaintiffs argue that a desire to grant a windfall to a powerful constituency influenced the City Council. However, the unstated motivations of the City Council are not relevant to the questions now before the Court. *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."). The rent control ordinance does not constitute a regulatory taking.

### III. CONCLUSION

The City Council acted within the legitimate scope of its regulatory power when it acted to adjust the balance of investment expectations between the park owners and the tenants. The Court cannot usurp the City Council's legislative power by substituting its own judgment regarding the manner in which the investment expectations of the tenants and the owners should be balanced. The City Council chose to favor the tenants' investments over those of the park owners, and the Court, although it believes that the rent control ordinance is far more onerous than necessary, must accept that legislative choice.

The rent rollback and the moratorium provisions following the enactment of the City's rent control ordinance and the expiration of long term leases, as well as the fair return provision as it applies to the adjustment of base rent, are facially invalid because they fail to provide due process to the park owners. The ordinance in all other respects survives the plaintiffs' facial due process and equal protection challenges. Likewise, the rent control ordinance does not, on its face, effect a taking of the park owners' properties for which just compensation is required.